**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dawn S. Cameron, | No. CV 07-8167-PCT-NVW |
| Plaintiff, | **ORDER** |
| vs. | |
| Michael J. Astrue, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff's Motion for Summary Judgment (doc. #17) is pending before the Court.

**I.    Background**

    **A.    Factual Evidence**

Cameron was born in 1964.  (AR 64.)  When she applied for Supplemental Security Income ("SSI") benefits, Cameron alleged she was unable to work because of fibromyalgia, diabetes, neuropathy, memory loss, hyperactive thyroid, tumor surgery, and uncontrollable sugar.  (AR 77.)

Cameron is diabetic, has difficulty maintaining appropriate blood sugar levels, and has been treated for diabetic neuropathy, carpal tunnel syndrome, and hyperthyroidism. (AR 132-45, 156, 197-98, 356-57, 388.)  Cameron used methamphetamine before and during 2004 and 2005 although on some occasions in 2004 and 2005 she reported that she

1  had quit using all drugs and alcohol.  (AR 176-77, 283, 306, 308, 348, 350, 493-94.)  She

2  smokes about a half pack of cigarettes daily.  (AR 494.)

3       Cameron's past work experience includes fast food worker, inventory clerk,

4  housekeeper, roofer, and printer.  (AR 78.)  In March 2004, Cameron stopped working at

5  a Wendy's restaurant because, in her words, "Body said stop, go get healthy, so did my

6  boss Relmond Rice."  (*Id.*)  She said that her "body wouldn't keep up" with her mind and

7  that she had "a lot of memory loss."  (*Id.*)  Mr. Rice, the General Manager of Wendy's,

8  Kingman, Arizona, wrote:

9       When I first hired Dawn, she was a very good worker.  As her fibromyalgia
        and diabetes progressed, [her] work ability declined at the same rate.
10      Finally she was unable to perform the simplest jobs which resulted in her
        losing her job.  We worked with her as much as possible to the point it was
11      hurting us.

12 (AR 85.)

13      From May 2004 through November 2005, Cameron was treated intermittently at

14 the Mohave Mental Health Clinic.  (AR 176-192, 270-352, 430-450.)  In June 2004,

15 Cameron was talkative, normally responsive, logical in her thought processes, and

16 oriented to time, place, person, and situation.  (AR 189.)  She had a good recent and

17 remote memory.  (*Id.*)  She also had inflated self-esteem, limited judgment and impulse

18 control, and poor insight about her situation and was grandiose and obsessed about her

19 ex-partner.  (*Id.*)  She reported having used methamphetamine after the death of a friend

20 five months before and until three weeks before the June 16, 2004 office visit.  (AR 183-

21 84.)

22      On two office visits in July 2004 and another in August 2004, Cameron was

23 oriented to all four spheres, dressed appropriately, spoke coherently, and displayed logical

24 thinking and normal perception.  (AR 179, 339, 341-42.)  Her behavior was calm and

25 cooperative.  (*Id.*)

26      On October 25, 2004 (signed November 4, 2004), examining physician Robert

27 Barker, M.D., noted that Cameron's diabetes was under poor control, she had findings

28 consistent with diabetic neuropathy, and there was no evidence of fibromyalgia or carpal

1    tunnel syndrome.  (AR 201, 204.)  Dr. Barker found Cameron alert, oriented, and able to

2    walk, squat, and move normally.  (AR 203.)  He found Cameron could climb, balance,

3    stoop, kneel, crouch, and crawl and did not need any assistive devices.  (AR 204, 208.)

4    Despite abnormal sensation in her left hand, Cameron had no functional limitation in

5    either hand, no limitation in pushing or pulling, and no manipulative limitations in

6    reaching, grasping, fingering, twisting, and working with both hands.  (AR 204, 209.)  Dr.

7    Barker found that Cameron could easily walk a block over rough and uneven surfaces, go

8    up and down stairsteps at a reasonable pace without a handrail, and use her upper

9    extremities to prepare meals, handle paperwork, and file papers above and below the

10   waist level or even overhead.  (AR 204-05.)  He advised that Cameron should avoid

11   extreme heat and cold due to decreased peripheral circulation.  (AR 204.)

12        On November 12, 2004, nonexamining State agency physician Robert Hopkins,

13   M.D., reviewed the medical evidence and opined that Plaintiff could perform activities

14   consistent with work requiring a medium level of exertion.  (AR 207.)

15        On November 14, 2004, examining psychologist Minette N. Doss, Ed.D., reported

16   that Cameron had a narcissistic personality disorder and was not psychotic but may

17   misinterpret social situations.  (AR 214-15.)  She described Cameron as "very directive

18   and controlling with a strong sense of entitlement" and one who "seems to thrive on

19   interpersonal conflicts and tried to lead encounters in this direction."  (*Id.*)  After stating

20   that Cameron "has a superiority complex and a sense of entitlement," "seems to put

21   herself first," and "shows arrogant and haughty behaviors," Dr. Doss concluded, "She is a

22   difficult person to be around."  (AR 219.)  Dr. Doss also noted several claims Cameron

23   made that were objectively false, *e.g.*, she claimed to have lost 100 pounds in the last six

24   months.  (AR 218.)

25        Dr. Doss concluded Cameron's ability to carry out very short and simple

26   instructions was moderately limited based on finding "she knows it all."  (AR 222.)  Dr.

27   Doss concluded Cameron's ability to carry out detailed instructions was moderately

28   limited based on finding "more a superiority complex than lack of ability."  (*Id.*)  Dr.

1  Doss concluded Cameron's ability to work in coordination with or proximity to others

2  without being distracted by them was moderately limited because Cameron "would be

3  telling them what to do."  (*Id.*)  Dr. Doss concluded Cameron's ability to accept

4  instructions and respond appropriately to criticism from supervisors was markedly limited

5  (poor or none) based on finding Cameron was narcissistic.  (*Id.*)  Dr. Doss concluded

6  Cameron's ability to get along with coworkers or peers without distracting them or

7  exhibiting behavioral extremes was markedly limited (poor or none) based on finding

8  Cameron was antagonistic and had a sense of entitlement.  (AR 224.)

9       On November 15, 2004, nonexamining State agency psychologist, Francis Enos,

10  Ph.D., reviewed the existing medical evidence, noted Dr. Doss's report (AR 238), and

11  opined that Cameron had a personality disorder that was not "severe" (AR 226).

12       In January 2005, Cameron was discharged from Mohave Mental Health Clinic

13  services because she did not show up for therapy appointments and did not respond to

14  telephone calls or letters.  (AR 301.)  Her diagnoses included amphetamine abuse and

15  borderline personality disorder.  (*Id.*; *see* AR 310.)

16       On April 5, 2005, nonexamining State agency psychologist Jane George, Ph.D.,

17  reviewed the existing medical evidence and diagnosed a narcissistic personality disorder

18  and a substance addiction disorder.  (AR 244, 251.)  She noted Cameron's superiority

19  complex and sense of entitlement.  (AR 256.)  She found moderate limits in Cameron's

20  ability to work in coordination with or proximity to others without being distracted by

21  them, ability to complete a normal workday and workweek without interruptions from

22  psychologically based symptoms and to perform at a consistent pace without an

23  unreasonable number and length of rest periods, ability to interact appropriately with the

24  general public, ability to ask simple questions or request assistance, and ability to accept

25  instructions and respond appropriately to criticism from supervisors.  (AR 258-59.)  Dr.

26  George found markedly limited Cameron's ability to get along with coworkers or peers

27  without distracting them or exhibiting behavioral extremes.  (AR 259.)  Dr. George found

28  no significant limitation of Cameron's ability to carry out very short and simple

1  instructions, ability to carry out detailed instructions, or ability to maintain attention and
2  concentration for extended periods.  (AR 258.)

3      On April 13, 2005, Cameron returned to the Mohave Mental Health Clinic because
4  she heard voices or whispering saying negative things about her.  (AR 309.)  She was
5  unable to focus, respond to questions, and stay on topic.  (*Id.*)  She reported having last
6  used methamphetamine four months before.  (*Id.*)

7      On May 5, 2005, Cameron was voluntarily admitted to the Mohave Mental Health
8  Clinic's Psychiatric Health Facility with admitting diagnoses of methamphetamine abuse
9  and depressive disorder, not otherwise specified.  (AR 277, 298.)  At admission, she was
10  alert, oriented, somewhat uncooperative, and difficult to interview.  (AR 277.)  Her
11  thought processing appeared to be normal, her short term memory and concentration were
12  impaired, and her insight and judgment were questionable.  (*Id.*)  On May 12, 2005,
13  Cameron was discharged.  (AR 289, 441.)  Cameron's treatment record for May 12, 2005,
14  states that her blood sugars were much better controlled now that she was on "a
15  reasonable diet that is regulated."  (AR 441.)  During a follow-up visit on May 16, 2005,
16  Cameron reported that she was doing much better since going to the Psychiatric Health
17  Facility, was able to get her blood sugar regulated while there, and able to maintain it now
18  at home.  (AR 322.)

19      On May 27, 2005, Cameron requested a refill and increase of her prescription for
20  Klonopin, of which she had been taking twice as much as prescribed.  (AR 319-20.)  She
21  had not followed up with her therapist as instructed at discharge from the Psychiatric
22  Health Facility.  (AR 320.)  Although Cameron had indicated she planned to move in
23  June 2005 to Missouri, she did not obtain referrals for the new area and did not provide
24  Mohave Mental Health Clinic with her new address.  (AR 444.)

25      At the December 15, 2005 administrative hearing, Cameron testified that she is
26  unable to work because:  "I lose train of thought.  I lose my memory really quickly.  I
27  pass out on the job.  I wander off."  (AR 489.)  She said that in 2005 she worked in

28

1    construction for two and a half months, but had to quit because she kept passing out and

2    going into shock.  (*Id.*)

3           Vocational expert witness Mark Kelman testified that Cameron's past relevant

4    work consisted of fast food worker, maid, inventory clerk, printer, and graphic design.

5    (AR 498).  Considering the physical functional limitations imposed by nonexamining

6    physician Dr. Hughes (AR 262-69) and some mild or moderate mental limitations, Mr.

7    Kelman testified that Cameron could perform all of her past relevant work except roofer.

8    (AR 498-99.)   Considering mental limitations found by Dr. Doss, *i.e.*, moderate

9    restrictions regarding ability to carry out very short and simple instructions, ability to

10   carry out detailed instructions, ability to work in coordination with or proximity to others

11   without being distracted by them, ability to complete a normal workday and workweek

12   without interruptions from psychologically based symptoms, ability to perform at a

13   consistent pace without an unreasonable number or length of rest periods, ability to

14   interact appropriately with the general public, and ability to ask simple questions or

15   request assistance and marked limitations in the ability to accept instructions and respond

16   appropriately to criticism from supervisors and ability to get along with co-workers or

17   peers without distracting them or exhibiting behavioral extremes, Mr. Kelman testified

18   there would be no jobs in the economy for a person with those limitations.  (AR 499-500.)

19          At the March 7, 2006 supplemental administrative hearing, psychological expert

20   witness Edward Jasinski, Ph.D., testified that, based on the record evidence, Cameron has

21   a personality disorder and a substance abuse problem.  (AR 506).  Dr. Jasinski testified

22   that Cameron had mild limitations in activities of daily living, concentration, persistence,

23   and pace and moderate limitations in social functioning.  (AR 507.)   Dr. Jaskinski opined

24   that none of Cameron's impairments were severe.  (*Id.*)  Vocational expert witness

25   George Bluth testified that someone with the mental functional limitations identified by

26   Dr. Jasinski would be able to perform all of Cameron's past relevant work.  (AR 509.)

27

28

1

### B.    Procedural History

2       On April 14, 2004, Plaintiff Dawn S. Cameron protectively filed an application for

3   SSI benefits, alleging disability beginning March 11, 2004.  (AR 64-66.)  The claim was

4   denied initially on November 30, 2004, and upon reconsideration on April 13, 2005.  (AR

5   37-40, 43-46.)  Upon timely written request, a hearing was held on December 15, 2005,

6   and a supplemental hearing was held on March 7, 2006.  (AR 49, 57.)

7       On June 16, 2006, Administrative Law Judge Ronald S. Robins determined that

8   Cameron is not disabled under section 1614(a)(3)(A) of the Social Security Act.  (AR 26.)

9   He found that she has two severe mental impairments, personality disorder NOS ("not

10   otherwise specified") and substance abuse disorder, and no physical impairment expected

11   to be severe for twelve months.  (AR 23.)  The ALJ found that Cameron's medically

12   determinable impairments could reasonably be expected to produce the symptoms she

13   alleges, but her allegations concerning the intensity, duration, and limiting effects of these

14   symptoms are not entirely credible.  (AR 24, 25.)  Reasons for finding only partial

15   credibility include evidence that Cameron successfully worked for a number of years

16   despite her longstanding personality disorder, continued to use methamphetamine during

17   the time period under consideration, and was able to perform activities of daily living

18   from which it could be inferred she is able to engage in substantial gainful activity.  (AR

19   25.)

20       The ALJ concluded that the objective medical evidence fails to establish that

21   Cameron has had a physical impairment that would be severe for twelve consecutive

22   months and also fails to establish that her severe mental impairments would cause

23   limitations in her ability to function sufficient enough to preclude all substantial gainful

24   activity twelve consecutive months.  (AR 25.)  In comparing Cameron's residual

25   functional capacity with the physical and mental demands of her past relevant work, the

26   ALJ found that Cameron is able to perform her past relevant work as it is generally

27   performed in the national economy.  (AR 26.)  Therefore, the ALJ determined under 20

28

1  C.F.R. § 416.920(f) that Cameron has not been under a "disability," as defined in the

2  Social Security Act, at any time through the date of his decision.

3      In making his determinations, the ALJ gave little weight to the opinions of

4  examining physician Dr. Barker, the nonexamining State agency physician Dr. Hopkins,

5  and the nonexamining State agency psychologist Dr. George that Cameron has the

6  residual functional capacity for only a medium level of exertion because the ALJ found

7  the evidence supported a conclusion that she had no physical impairment that would be

8  severe for twelve months and, therefore, no exertional limitations.  (AR 24.)  The ALJ

9  gave significant weight to the opinion of psychological expert witness Dr. Jasinski

10 regarding Cameron's limitations in activities of daily living, social functioning, and

11 concentration, persistence, or pace and more weight than examining psychologist Dr.

12 Doss's or some of nonexamining psychologist Dr. George's opinions because a

13 conclusion that Cameron has a severe mental impairment is more consistent with the

14 evidence as a whole.  (AR 25.)

15     On November 2, 2007, the ALJ's decision became the Commissioner's final

16 decision when the Appeals Council denied Cameron's request for review.  (AR 6.)  On

17 December 20, 2007, Cameron commenced this action for judicial review.  (Doc. #1.)

18 **II.    Standard of Review**

19     The court reviews only those issues raised by the party challenging the ALJ's

20 decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court may set

21 aside the Social Securities Administration's disability determination only if the

22 determination is unsupported by substantial evidence or is based on legal error.  *Orn v.*

23 *Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is more than a scintilla,

24 less than a preponderance, and relevant evidence that a reasonable person might accept as

25 adequate to support a conclusion considering the record as a whole.  *Id.*  In determining

26 whether substantial evidence supports a decision, the court must consider the record as a

27 whole and may not affirm simply by isolating a "specific quantum of supporting

28 evidence."  *Id.*

1    "The opinions of non-treating or non-examining physicians may also serve as

2    substantial evidence when the opinions are consistent with independent clinical findings

3    or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

4    As a general rule, "[w]here the evidence is susceptible to more than one rational

5    interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

6    upheld." *Id*. at 954 (citations omitted).

7        The ALJ is responsible for resolving conflicts in medical testimony, determining

8    credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

9    1995).  In reviewing the ALJ's reasoning, the court is "not deprived of [its] faculties for

10   drawing specific and legitimate inferences from the ALJ's opinion." *Magallanes v.*

11   *Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

12   **III.    Analysis**

13       Cameron requests relief in the form of an order reversing Defendant's

14   administrative decision or, in the alternative, remanding the matter for a new hearing.

15           **A.    Substantial Evidence Supports the ALJ's Assessment of Cameron's**
             **Mental Functional Limitations.**

16

17       First, Cameron argues, in essence, that the ALJ erred because he did not expressly

     document everything he reviewed in the record.  The record includes references to

18

     numerous disorders, problems, and issues written by Cameron on various forms or

19

     reported by Cameron, but most of those references are either not supported by medical

20

     evidence from the relevant time period (or any time period) or are not relevant to whether

21

     she has a disability as defined by the Social Security Act.  For example, although

22

     Cameron reported suicide ideation during her in-patient stay at the Mohave Mental Health

23

     Clinic Psychiatric Health Facility in May 2005, records showed no evidence of suicide

24

     ideation upon discharge, and there is no indication that Cameron's suicide ideation, if

25

     any, affects her residual functional capacity or her ability to work whatsoever.  (AR 277,

26

     289.)  The ALJ was not required to recite Cameron's reports of lesbian and straight

27

     relationships, prior self-mutilation, insomnia, anxiety, or sadness regarding her teenaged

28

1   son being in a detention facility because there is no evidence of record that any of those

2   conditions were relevant.

3        Second, Cameron argues that the ALJ erred by giving nonexamining psychologist

4   Dr. Jasinki's opinions of Cameron's limitations more weight than examining psychologist

5   Dr. Doss's opinions or nonexamining psychologist Dr. George's opinions in determining

6   Cameron's residual functional capacity.  None of these psychologists treated Cameron.

7        Under Social Security Administration regulations, medical source opinions are

8   considered together with the rest of the relevant evidence submitted.  20 C.F.R.

9   § 404.1527(b).  Opinions on certain issues are reserved to the Commissioner because they

10  are administrative findings that determine the decision of disability.  20 C.F.R.

11  § 404.1527(e).  At step four of the five-step sequential evaluation process for

12  determining whether an individual is disabled, 20 C.F.R. § 416.920(a), the ALJ assessed

13  Cameron's residual functional capacity and past relevant work.  The ALJ was not

14  required to defer to medical source opinions in making such dispositive administrative

15  findings.  Although the ALJ generally gives more weight to the opinion of a medical

16  source who has examined the claimant than that of a nonexamining source, 20 C.F.R.

17  § 404.1527(d)(1), the ALJ is not bound by any findings made by medical sources and

18  must evaluate such findings in light of the supporting evidence in the case record,

19  supporting explanations provided by the medical source, and any other factors relevant to

20  the weighing of the opinions.

21       The ALJ found that the evidence as a whole supported finding no limitation,

22  instead of moderate limitation, in the areas under sustained concentration and persistence,

23  *i.e.*, ability to carry out very short and simple instructions, ability to carry out detailed

24  instructions, ability to work in coordination with or proximity to others without being

25  distracted by them, and ability to complete a normal workday and workweek without

26  interruptions from psychologically based symptoms and to perform at a consistent pace

27  without an unreasonable number and length of rest periods.  (AR 25, 222-23.)  The ALJ

28  also found that the evidence as a whole supported finding moderate limitation, instead of

1    marked limitation, in social functioning, *i.e.*, ability to accept instructions and respond
2    appropriately to criticism from supervisors and ability to get along with coworkers or
3    peers without distracting them or exhibiting behavioral extremes.  (AR 25, 223-24.)
4            Dr. Doss's written comments support the ALJ's findings.  For example, she
5    assessed Cameron as moderately limited in the ability to carry out very short and simple
6    instructions because "she knows it all."  (AR 222.)  She assessed Cameron as moderately
7    limited in the ability to carry out detailed instructions, but clarified it was based on "more
8    a superiority complex than lack of ability."  (*Id.*)  Dr. Doss's conclusion that Cameron's
9    ability to get along with others is markedly limited because she would be telling them
10   what to do, is narcissistic, and has a sense of entitlement does not establish that Cameron
11   is *unable* to adjust her behavior to get along with others in a work environment, only that
12   the behavior Cameron displayed during Dr. Doss's interview would make it difficult for
13   others to work with her.
14           Moreover, Dr. Doss's assessment may have been colored by her experience with
15   Cameron.  Dr. Doss found her "difficult to interview," "irritated and irritating," "very
16   directive," having an "intense personality," seeming to "thrive on interpersonal conflicts,"
17   "difficult to interview because of her irritated and irritating manner," "very directive to
18   the psychologist as to what the doctor should write down," "annoyed," "did not hide her
19   disgust in any way," "[h]er anger was very close to the surface," "seems to put herself
20   first," "shows arrogant and haughty behaviors," and "uses her behavior to keep people at
21   a distance."  (AR 214-19.)  Dr. Doss mentioned that Cameron previously had resided two
22   blocks away from Dr. Doss's office, and Dr. Doss "is certainly aware of Dawn's large
23   dog which she never kept restrained."  (AR 217.)  Dr. Doss made frequent reference to
24   what Cameron "claims," as though Cameron's statements are incredible, *e.g.*, "[a]lthough
25   she claims she was not fired, her boss said that she could not do the job anymore";
26   Cameron "claims she cannot breathe in public and cannot carry on a conversation," but
27   neither problem was evident during the assessment; and Cameron claimed to have lost
28   100 pounds in the past six months, but the psychologist had seen her during that time and

1   "she was anything but a 100 pounds heavier." (AR 216-17.) Dr. Jasinski does not

2   disagree with or contradict any of Dr. Doss's findings, but he concludes more objectively

3   that Cameron's limitations are of a lesser degree.

4        Similarly, the ALJ's findings did not disagree with or contradict any of Dr.

5   George's findings except with regard to the ultimate conclusions of the degree of

6   functional limitation in a few areas. In fact, Dr. George's opinions regarding Cameron's

7   ability to carry out simple and detailed instructions support the ALJ's decision. (AR

8   258.)

9        Despite Cameron's personality disorder and substance abuse problems, she

10  reported to Dr. Doss that she was able to take the bus to town, spend the day walking

11  around town, watch television, make her own dinner, talk on the telephone, and take care

12  of her personal hygiene. (AR 217.) Cameron's longstanding personality disorder did not

13  preclude her from working in a fast food restaurant from August 2001 to March 2004.

14  (AR 77-78, 285-87.) Moreover, there is no evidence that her employment at the fast food

15  restaurant was terminated because of her personality disorder and substance abuse

16  problems. (*See* AR 85.) Thus, Dr. Jasinski's opinion that Cameron has only moderate

17  limitations in social functioning is more consistent with the evidence as a whole.

18       Third, Cameron argues that the ALJ erred by implicitly rejecting the opinions of

19  the treating specialists at Mohave Mental Health Clinic that she suffers from moderate

20  functional limitations. However, Cameron does not identify any record evidence of such

21  opinions, and Cameron acknowledges that Mohave Mental Health Clinic failed to

22  complete a Mental Impairment Report. (Doc. #18, ¶ 37.) In fact, Mohave Mental Health

23  Clinic wrote that it not only was unable to fully complete the form due to limited time and

24  resources, "the physician is not able to answer many of the questions asked on this form

25  as there has not been an opportunity to explore the impact that the mental illness has on

26  work related topics." (AR 175.) In her Reply, Cameron argues that by assigning a GAF

27  score of 55 (AR 191), Mohave Mental Health Clinic necessarily determined that Cameron

28  has moderate symptoms or limitations in psychological, social, and occupational

1   functioning.  The ALJ was not required to speculate how the GAF score of 55 related to
2   specific functional limitations or to find the GAF score's implied assessment of *moderate*
3   limitations supported Dr. Doss's findings of *marked* limitations.

4         Therefore, substantial evidence supports the ALJ's assessment of Cameron's
5   mental functional limitations, and the ALJ did not err by finding Cameron has moderate
6   limitations in social functioning that do not preclude all work.

7         **B.    The ALJ Did Not Err in Finding That Personality Disorder and**
        **         Substance Abuse Disorder Were Cameron's Only Severe Impairments.**
8
9         Cameron contends that the ALJ erred by failing to find Cameron has severe
10  impairments of uncontrolled diabetes, diabetic neuropathy, and hyperactive thyroid
11  disease.  The medical evidence establishes that Cameron's diabetes is controllable and
12  was controlled when her diet was reasonably regulated.  (AR 441.)  There is no evidence
13  that either diabetic neuropathy or hyperthyroidism causes any functional limitation except
14  to avoid extreme heat or cold conditions.  None of the examining and nonexamining
15  witnesses found that Cameron has a severe impairment of uncontrolled diabetes, diabetic
16  neuropathy, or hyperactive thyroid disease.

17        Therefore, the ALJ did not err in finding that personality disorder and substance
18  abuse disorder were Cameron's only severe impairments.

19        **C.    The ALJ Did Not Err in Finding Cameron's Allegations Not Entirely**
        **         Credible and Provided the Required Clear and Convincing Reasons.**

20        "If the ALJ finds that the claimant's testimony as to the severity of [his] pain and
21  impairments is unreliable, the ALJ must make a credibility determination with findings
22  sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily
23  discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).
24  The court may not engage in second-guessing if the ALJ's credibility finding is supported
25  by substantial evidence in the record.  *Id.* at 959.

26        The ALJ rejected Cameron's allegations of the degree of her mental impairments
27  and limitations as not credible and stated five specific reasons for the determination.  (AR
28  25.)  As shown above, the record does not support Cameron's allegations of severe

1    physical impairments and limitations.  The record shows that Cameron successfully

2    worked for a number of years despite her longstanding personality disorder.  Her

3    continued illegal drug use during the time period under consideration and her inconsistent

4    statements regarding periods of use detract from her credibility.  Moreover, it may be

5    inferred from Cameron's claimed memory loss and admitted use of methamphetamine

6    during the time period under consideration that she may not be completely accurate in

7    recalling or assessing the degree of her mental impairments and limitations.

8           Thus, substantial evidence supports the ALJ's credibility finding.

9    **D.     The ALJ Did Not Err in Failing to Consider the Third Party
             Statement.**

10          Cameron contends the ALJ erred by failing to comment on the statement by Mr.

11   Rice, Cameron's boss at Wendy's, which was a paragraph written in support of her

12   application for SSI benefits.  (AR 85.)  Mr. Rice said that when he hired Cameron, she

13   was "a very good worker," but that her work ability declined at the same rate as the

14   progression of her diabetes and fibromyalgia.  (*Id.*)  His statement implies, but does not

15   directly claim, that diabetes and fibromyalgia caused Cameron to become "unable to

16   perform the simplest jobs which resulted in her losing her job."  (*Id.*)  However, there is

17   no evidence of record that Cameron has ever been diagnosed with fibromyalgia, much

18   less that her condition deteriorated during the two and one-half years she was employed

19   by Wendy's.  There also is no evidence of record that her diabetes "progressed"

20   throughout her employment.  There only is evidence that Cameron's diabetes can be

21   controlled by insulin and regulated diet, but it frequently was not controlled during the

22   relevant period.  Mr. Rice's non-medical conclusion that the decline in Cameron's work

23   performance was related to diabetes and fibromyalgia is, therefore, not relevant.

24          Further, the ALJ did not reject Mr. Rice's statement.  Although the ALJ did not

25   expressly refer to the statement, it likely is one of the bases for finding "she successfully

26   worked for a number of years despite her longstanding personality disorder."  (AR 25.)

27   Omission of express reference to Mr. Rice's statement is harmless.

28

**IV.    Conclusion**

  The Commissioner's decision that Cameron  has not been under a "disability," as defined in the Social Security Act, at any time through the date of the decision is supported by substantial evidence and is not based on legal error.

  IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment (Doc. #17) is denied.

  IT IS FURTHER ORDERED that the clerk enter judgment for Defendant and that Plaintiff shall take nothing.  The clerk shall terminate this case.

  DATED this 6th day of November, 2008.

Neil V. Wake
United States District Judge